**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
─────────────────────────────────
                                  )
ALLIED PILOTS ASSOCIATION,        )
                                  )
              Plaintiff,          )
                                  )  Civil Action No. 08-191 (EGS)
         v.                       )
                                  )
AMERICAN AIRLINES, INC.,          )
                                  )
              Defendant.          )
─────────────────────────────────)
```

## MEMORANDUM OPINION

This case involves a dispute between the Allied Pilots Association ("APA" or "Plaintiff") and American Airlines ("American" or "Defendant") regarding American's unilateral modification of its Airport Familiarization Requirements for its pilots during contract negotiations under § 6 of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"). Pending before the Court is Defendant's Motion for Summary Judgment and Plaintiff's Motion for Preliminary and/or Permanent Injunction. Upon consideration of the motions, the responses and replies thereto, the applicable law, and the entire record, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Preliminary or Permanent Injunction for lack of subject matter jurisdiction.

I.      **BACKGROUND**

   **A. The Parties and the "Green Book"**

   American is a "common carrier by air engaged in interstate
and foreign commerce" within the meaning of the RLA.  Def.'s SMF
¶ 1 (citing 45 U.S.C. § 181).  The APA is the certified
collective bargaining representative of the airline pilots
employed by American.  Def.'s SMF ¶ 2.  Over the years, the APA
and American have entered into a series of collective bargaining
agreements, commonly referred to as the "Green Book."  Def.'s SMF
¶ 5.

   The Green Book provides the controlling terms and conditions
of employment for American's pilots, including provisions
addressing the compensation that pilots receive for time spent in
training.  Def.'s SMF ¶ 5; Pl.'s SMF ¶¶ 5-8.  Pilots at American
are required to undergo training when they are initially assigned
to a particular aircraft and for recurrent training every nine
months at American's Flight Academy, in Fort Worth, Texas.  Pl.'s
SMF ¶ 6.  Pursuant to the Green Book, pilots are compensated for
time spent operating the aircraft; time spent in training at the
Flight Academy; time spent traveling to and from the Flight
Academy; time spent between flights during multiday flight
sequences, including time spent overnight at hotels between
flights; and one hour of preflight preparation time prior to a
flight's scheduled departure.  Pl.'s SMF ¶ 20.  The Green Book

2

also requires pilots to complete six hours of "distance training" every eighteen months.[1]  While pilots are not specifically compensated for this six hour distance learning component, they may complete the task in other compensated times such as during breaks at the Flight Academy.  *See* Def.'s Resp. to Pl.'s SMF ¶ 18.

The most recent Green Book went into effect on May 1, 2003. Def.'s SMF ¶ 6.  While the amendable date of the most recent Green Book was May 1, 2008, the contract contained an early opener provision, which allowed either party to begin negotiations for a successor agreement any time after May 1, 2006, upon 60 days notice.  Def.'s SMF ¶ 7.  On July 21, 2006, American exercised its right to commence negotiations, and the

---

[1]  The Federal Aviation Administration defines distance training as "training without an instructor or classroom or a use of a flight training device or a simulator, or without being presented or proctored by an instructor."  Pl.'s SMF ¶ 10. American's current distance training consists of computerized materials and examinations to be completed at a pilot's discretion.  American does not dispute that, other than the six hour distance learning component that American requires, the Green Book currently provides that all other training is to occur within the training day at the Flight Academy.  Def.'s Resp. to Pl.'s SMF ¶ 13.  American has made unsuccessful attempts in the past to negotiate increases in the distance training program with the APA.  *See* Pl.'s SMF ¶¶ 14-15.  The parties, however, are currently engaged in renewed discussions regarding the imposition of new distance learning requirements as part of ongoing § 6 negotiations for a Green Book.  *See* Pl.'s SMF ¶ 56.  The parties dispute whether the negotiations regarding distance learning encompass the Airport Familiarization Modules at issue in this case.  *See infra* n. 5; *see also* Pl.'s SMF and Def.'s Resp. Thereto ¶¶ 62-64.

parties have been engaged in formal contract negotiations under
§ 6 of the RLA since that time.  Def.'s SMF ¶ 59.

**B. Events Leading Up to the Dispute at Issue**

The Federal Aviation Administration ("FAA") and American
have established certain requirements that pilots must satisfy in
order to be qualified to fly into or take off from certain
designated airports ("special qualification airports").  Def.'s
SMF ¶¶ 16, 20-21; *see also* Fed. Aviation Reg. § 121.455.  These
requirements include American's "Airport Familiarization
Requirements."  Def.'s SMF ¶ 16.  The purpose of the Airport
Familiarization Requirements is to assist pilots in gaining
familiarity with the unique conditions of certain airports prior
to flight.  Def.'s SMF ¶ 16.  These requirements are set forth in
American's Flight Manual, which contains the operating policies
and procedures governing American's pilots.  *See* Def.'s SMF ¶ 20.

American's Airport Familiarization Requirements are
determined and set by American's Managing Director of Flight
Operations and American's Vice President of Flight, with advice
from American's Flight Operations Council.  Def.'s SMF ¶¶ 18-19.
Over the years, American has made numerous modifications to its
Airport Familiarization Requirements for pilots.  *See* Def.'s SMF
¶¶ 27, 35.  For instance, at different points in time, American
has required its pilots to review FAA approved "photo pages" of
special qualification airports, watch videos regarding the

4

airports, or serve as a "pilot flight crewmember" on a flight to these airports.  Def.'s SMF ¶¶ 29, 32.  Pilots were never specifically compensated for viewing the photo pages or watching the videos, although review of these materials generally occurred during the one hour of preflight preparation time for which pilots are compensated.  Def.'s SMF ¶¶ 30, 33.

In 2005, American began developing computer-based programs to satisfy its Airport Familiarization Requirements ("Airport Familiarization Modules").  The programs were developed using "Flightscape" - a computer flight modeling system used by the National Transportation Safety Board for incident and accident investigations.  *See* Def.'s SMF ¶ 13 ("Flightscape software permitted American to create a computerized display, using satellite imagery, terrain elevation data, and actual radio transmissions to give its pilots a comprehensive view of what it is like to fly into a particular airport.")  The Flightscape-based Airport Familiarization Modules educate pilots on "where [a particular] airport is, areas of concern for the airport, approach and departure procedures," as well as a "flight animation tool that presents flight landing as a video."  Def.'s SMF ¶ 14.  American considers the Airport Familiarization Modules to be an enhanced version of its airport familiarization videos and "picture pages," and the APA concedes that the modules provide familiarization for certain airports.  *See* Def.'s SMF

¶ 34 and Pl.'s Resp. Thereto.  American's Airport Familiarization Modules are available to its pilots online through American's website, AAPilots.com.  Def.'s SMF ¶ 15.

On February 8, 2006, American briefed the APA on its initial development of the Airport Familiarization Modules.  Def.'s SMF ¶ 22.  During this meeting, American informed the APA that it did not intend to specifically compensate pilots for their review of the modules, consistent with American's past practice regarding its Airport Familiarization Requirements.[2]  Def.'s SMF ¶ 23; *see also* Def.'s SMF ¶ 24 ("The Green Book contains provisions addressing compensation pilots receive for training.  The Green Book has never provided that pilots are to be compensated for time spent fulfilling American's Airport Familiarization

---

[2]  The parties dispute whether American told the APA that the Airport Familiarization Modules should be reviewed as part of preflight duties.  *See* Def.'s Resp. to Pl.'s SMF ¶ 31 ("American disputes that it told APA representatives that it expected pilots to review the Flightscape-based Airport Familiarization modules during the hour of compensated pre-flight time.").  More generally, it is American's position that "[n]either [the Flight Manual] nor the Green Book indicates that Airport Familiarization requirements are to be performed in the one-hour, pre-flight period.  Pilots have completed the Flightscape Airport Familiarization requirements at homes, in hotels or at their bases." Def.'s Resp. to Pl.'s SMF ¶ 77.  The APA, however, focuses on the fact that prior to the November 2007 Revision "the Flight Manual consistently provided that any required review take place 'prior' to the pilot's first flight into the airport in question, without any further specification of how much 'prior' the review was to take place."  Pl.'s SMF ¶ 42.  This changed with the advent of the November 2007 Revision, however, as pilots were required to perform their review prior to assignment to a flight.  *See* Pl.'s SMF ¶ 76.

Requirements and American has never specifically paid pilots for completing Airport Familiarization Requirements."). On March 31, 2006, American officially revised its Flight Manual to require pilots to complete an Airport Familiarization Module for Guatemala City, Guatemala, prior to a pilot's first flight into that airport. *See* Def.'s SMF ¶¶ 25-26; *see also* Def.'s SMF ¶ 35 (explaining that the Guatemala City airport was the first airport for which an Airport Familiarization Module was developed). Pilots were permitted to complete this Airport Familiarization Module at home, in a hotel, at their bases, or after check-in if they had sufficient time to view the module during the one hour preflight period. Def.'s SMF ¶ 40.[3]

---

[3] Pilots have numerous responsibilities during this one hour preflight period, including planning for the aircraft, looking at weather patterns, completing the checklist regarding the aircraft, and briefing the crew. *See* Def.'s Ex. B, Dep. of Peter Horan at 71 (explaining that sometimes it takes more than one hour to complete these responsibilities because of "difficult weather conditions or re-releases of flight, delayed inbound crews"). Indeed, the APA acknowledged that it would often be difficult for pilots to complete both their general preflight duties and the required Airport Familiarization Module during the hour immediately preceding departure. *See* Pl.'s Ex. 8, APA News Digest dated June 9, 2006 ("Trying to fit Flightscape in with your other required duties after signing in for your trip may make it difficult to complete ALL your preflight duties prior to leaving for the aircraft. Because we know that pilots will take whatever time is necessary to properly prepare, departure delays may result from pilots taking the extra time to review the required video."). The APA advised its pilots, however, that "[t]here is NO requirement to accomplish this training at home, and there is no requirement to sign in early to view a video." Pl.'s Ex. 8, APA News Digest dated June 9, 2006.

After informally expressing concern to American regarding the requirement that pilots review Airport Familiarization Requirements without additional compensation, on May 3, 2006, the APA filed Presidential Grievance 06-021 ("Presidential Grievance") under the terms of the Green Book, protesting "the Company's failure to properly compensate pilots for training." *See* APA Resp. to Def.'s SMF ¶¶ 9-10 ("The grievance protested the lack of separate compensation for review [of the Airport Familiarization Modules] on the premise that review constituted a training event."); *see also* Def.'s Ex. 3, Presidential Grievance 06-021 ("Pursuant to the May 1, 2003, Agreement between [American] and the airline pilots in its service, as represented by the [APA], the undersigned, on behalf of all pilots, hereby files this grievance protesting the Company's failure to properly compensate pilots for training per § 6.D, and all related sections of the Agreement, and past practice."). Despite the pending grievance, American subsequently modified the Airport Familiarization Requirements in its Flight Manual on numerous occasions in 2006 and 2007, adding special qualification airports and modifying those for which the review of an Airport Familiarization Module would be required, strongly encouraged, or simply available. Def.'s SMF ¶¶ 35-36; Pl.'s SMF ¶ 42. As of November 12, 2007, American required pilots to review Airport

Familiarization Modules for 11 special qualification airports. Def.'s SMF ¶ 17.

On June 20, 2006, the APA Negotiating Committee presented American representatives with a proposal to resolve the Presidential Grievance regarding compensation for review for the Airport Familiarization Modules.  Def.'s SMF ¶ 42; *see also* Def.'s Ex. 19, Flightscape Pay Proposal dated June 20, 2006 (requesting that pilots be paid one hour of flight pay for each Airport Familiarization Module required to be viewed).  American rejected the proposal and presented a counter-proposal, which was subsequently rejected by the APA.  Def.'s SMF ¶¶ 44-45.  On July 7 and July 11, 2006, American presented two more formal counter-proposals.  *See* Def.'s SMF ¶¶ 50-52 (proposing that pilots be paid one minute of flight pay for every three minutes of time spent reviewing an Airport Familiarization Module).[4]

Amid negotiations on the Presidential Grievance, on July 21, 2006, American submitted notice to officially commence § 6 negotiations under the Green Book.  Def.'s SMF ¶ 59.  These § 6 Green Book negotiations are still ongoing.[5]

---

[4]  Under the terms of the Green Book in effect on October 24, 2007, one day of training pay was the equivalent of three hours of flight pay.  Def.'s SMF ¶ 66; Pl.'s SMF ¶ 8.

[5]  The parties dispute whether the Green Book negotiations subsumed the negotiations related to the Presidential Grievance. *Compare* Pl.'s SMF ¶ 52 ("As was traditional, the APA Board of Directors and its Negotiating Committee decided that the specific Flightscape/Airport Familiarization negotiations would be folded into the broader Section 6 negotiations.") *with* Def.'s Resp. to

Having received no response to its July 2006 counteroffer, on May 3, 2007, American submitted a proposal to the APA in which it renewed its efforts to settle the Presidential Grievance. *See* Def.'s SMF ¶ 55-57; Pl.'s Ex. 39, Letter from American to APA (explaining that "a negotiated resolution would be in the best interest of both parties," and offering to compensate pilots at a 1:3 ratio). On this same date, American also submitted a § 6 negotiation proposal on distance learning. *See* Pl.'s SMF ¶¶ 63-64. Soon thereafter, the APA reconstituted its negotiation team, and on October 24, 2007, the APA submitted a comprehensive proposal for the contents of the new Green Book, including a proposal on "Distance Learning/Web Based Training" as well as "[l]earning related to operational issues (e.g. Airport Familiarization — Flightscape)." Def.'s SMF ¶ 64; Pl.'s SMF ¶ 71; *see also* Def.'s SMF ¶¶ 65, 67 (proposing that "every six

---

Pl.'s SMF ¶ 52 ("American disputes that the opening of negotiations under Section 6 of the RLA necessitated any impact on the ongoing negotiations to settle the APA's pending grievance concerning the Flightscape-based Airport Familiarization program. Although APA took the position that issues concerning American's Flightscape-based Airport Familiarization program should be included in Section 6 negotiations, this was not American's position and American sought to resolve Presidential Grievance 06-021 independently of topics addressed in the Section 6 negotiations. Additionally, American disputes APA's contention that it was 'traditional' to include issues concerning Airport Familiarization or any other pending grievance in Section 6 negotiations." (internal citations omitted)).

hours, or portion thereof, of Distance Learning/Web Based training will equate to one day of training pay").[6]

While negotiations were ongoing, American began experiencing delayed departures for flights into special qualification airports because pilots who had not previously reviewed the Airport Familiarization Modules were reviewing the modules during the paid, one hour period immediately preceding the flight. Pl.'s SMF ¶ 72.  To prevent these departure delays, on October 5, 2007, American announced that it was going to revise its Flight Manual to require pilots to review the relevant Airport Familiarization Modules "in advance of any assignment" to a special qualification airport, rather than simply prior to the pilot's first flight to that airport.  Def.'s SMF ¶ 37; Pl.'s SMF ¶ 76.[7]  This revision became effective on November 12, 2007 (the "November 2007 Revision").  Def.'s SMF ¶ 37.  As a result of this

---

[6]  Under the APA's proposed pay scale, a pilot reviewing a one hour Airport Familiarization Module would receive three hours of flight pay.  *See* Def.'s SMF ¶ 67 and Pl.'s Resp. Thereto. American accuses the APA of engaging in regressive bargaining, which the APA disputes.  *See* Def.'s SMF ¶ 69 and Pl.'s Resp. Thereto.

[7]  Prior to instituting this change, however, on September 12, 2007, American issued a notice to pilots announcing that all pilots qualified to operate aircrafts used for "special qualification airports" would be required to review the Airport Familiarization Modules prior to November 1, 2007, rather than prior to the flight in question.  Pl.'s SMF ¶ 73.  American retracted the directive the following day, however, stating that "[t]he intent has always been for crewmembers to review the module before their initial trip into a city as part of their flight preparation." Pl.'s SMF ¶ 74.

change, pilots were no longer able to review the Airport
Familiarization Module during the one hour of paid preflight
preparation time.  *See* APA Resp. to Def.'s SMF ¶ 38 ("Although
American has not 'specifically' compensated pilots for time spent
completing American's Airport Familiarization Requirements, prior
to the [November 2007 Revision to the Flight Manual], that time
has always been paid time (unless a pilot chose to do the review
on his/her own time). [The November 2007 Revision] changed that
practice by requiring that the review take place prior to
<u>assignment</u> to the flight rather than prior to the flight (e.g.,
during preflight preparation)." (internal citations omitted)).

APA President, Lloyd Hill, wrote to American to protest the
November 2007 Revision, contending that it was a unilateral
change in compensation and was a violation of the "status quo"
provisions of § 6 of the RLA, 45 U.S.C. § 156.  *See* Pl.'s SMF
¶ 78 and Def.'s Resp. Thereto.  After American refused to rescind
the pre-assignment requirement, the APA filed a complaint in this
Court on February 1, 2008.  Comp. ¶ 1.  Currently pending before
the Court is American's motion for summary judgment and the APA's
motion for injunctive relief.  These motions are ripe for
determination.

## II.  STANDARD OF REVIEW

Summary judgment should be granted only if the moving party
has shown that there are no genuine issues of material fact and

that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F. 3d 989, 991 (D.C. Cir. 2002).  A fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F. 3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Facts are material if they "'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).  The party seeking summary judgment bears the initial burden of demonstrating an absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 322.  In determining whether a genuine issue of material facts exists, the Court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986); *Keyes v. Dist. of Columbia*, 372 F. 3d 434, 436 (D.C. Cir. 2004).  "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324.

## III. THE RAILWAY LABOR ACT

The RLA was enacted in 1926, and extended to air carriers in 1936. *See* 45 U.S.C. §§ 181-188. The purpose of the Act is to promote stability in labor-management relations in the transportation industry by providing a comprehensive framework for resolving labor disputes in order to avoid strikes and interruptions to interstate commerce. 45 U.S.C. § 151a; *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1992).

Under the RLA, courts lack jurisdiction to rule on the merits of a labor dispute between airline management and employee representatives. Instead, the court may only decide which statutorily-mandated dispute resolution procedure is appropriate, and in certain circumstances, issue an injunction to preserve the "status quo" pending an arbitral resolution. *See Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.* ("*Eastern II*"), 869 F.2d 1518, 1520 (D.C. Cir. 1989) (discussing the "dual framework" for resolving disputes under the RLA). The Court's involvement in a disagreement under the RLA is generally dependant on whether the dispute at issue is a "major dispute" or a "minor dispute." *Id.*

A major dispute "relates to disputes over the formation of collective bargaining agreements or efforts to secure them." *Elgin, Joliet & Eastern Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945); *see also id.* (explaining that major disputes "look to the acquisition of rights for the future, not to assertion of rights

14

claims to have vested in the past"). Major disputes generally involve a carrier's attempt to modify "rates of pay, rules, or working conditions" in a fashion not even arguably covered by the collective bargaining agreement. *See Conrail v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302-03 (1989); *Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18 (1st Cir. 2000). Major disputes are submitted to the National Mediation Board for voluntary arbitration and may be subject to intervention by the President. 45 U.S.C. § 154-60; *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.,* ("*Eastern I*"), 863 F.2d 891, 895 (D.C. Cir. 1988). The lengthy bargaining and mediation process associated with a major dispute must be exhausted before an employer can implement the contested change in rates of pay, rules, or working conditions. *Conrail*, 491 U.S. at 303. Accordingly, if an employer attempts to implement the contested change while this process is pending, the district court may issue an injunction to maintain the "status quo." *See id.* ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures[.]"). If no agreement is reached in the mediation process, the parties may resort to economic force, including strikes. *Id.* at 303; *see also Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 874 F.2d 439, 443-44 (explaining that the term "major dispute" comes from the fact that if one party to a

labor agreement refuses to bargain with the other, "this is an ominous sign that a strike is looming," and emphasizing the "major disruption" resulting from transportation strikes).

A minor dispute, by contrast, "contemplates the existence of a collective bargaining agreement." *Elgin*, 325 U.S. at 723. Consequently, minor disputes involve "the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 303.  A dispute is minor if it "'arguably' can be covered by the existing collective bargaining agreement." *Eastern I*, 863 F.2d at 896.  In determining whether an employer's position is "arguably justified" by the parties' collective-bargaining agreement, the Court may consider "implied contractual terms, as interpreted in light of past practice." *Conrail*, 491 U.S. at 307, 310; *see also Eastern I*, 863 F.2d at 896 ("To gain a complete picture of the relationship between the parties, and thus of the scope of the dispute to be settled by the provisions of the RLA, courts must consider the express terms of any agreements and well established practices that have developed through the past course of dealings.").  Minor disputes are subject to compulsory arbitration.  45 U.S.C. § 184; *Eastern I*, 863 F.2d at 895. Because an arbitration board has exclusive jurisdiction over minor disputes, "the courts do not have jurisdiction to issue

status quo injunctions." *Eastern I*, 863 F.2d at 895-96.[8]
Moreover, unlike major disputes, an employer is not required to
maintain the status quo pending resolution of the dispute.
*Conrail*, 491 U.S. at 303.

In sum, "[t]he court's jurisdiction to issue a status quo
injunction thus depends on whether the dispute is major or minor,
which in turn depends on whether an existing agreement covers the
subject in controversy." *Eastern II*, 869 F.2d at 1521.  In
determining whether a dispute is major or minor under the RLA,
"'the court does not consider the merits of the underlying
dispute; its role is limited to determining whether the dispute
can be characterized as involving the proper application or
meaning of a contract provision.'"  *Id.* (quoting *Ry. Labor Exec.
Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 704 (7th Cir.
1987)); *see also id.* at 1524 (concluding that the district court
"overstepped its bounds by allowing its view of the merits to
influence its characterization of the dispute as major or minor,"
and emphasizing that it "[i]t is the role of the arbitrator, not
the court, to choose between the parties' interpretation of the
Agreement.").  Indeed, the dispute is a minor one that must be

---

[8]  This Circuit has identified "one narrow exception to this
rule."  *Eastern II*, 869 F.2d at 1520 n.2.  A Court may issue a
minor dispute injunction "only when an injunction is necessary to
preserve the arbitrator's ability to decide the dispute."  *Id.*
In the present case, however, the APA has not claimed that it is
entitled to a minor dispute injunction.

submitted to arbitration, "*even if the court believes that one party's interpretation of the contract lacks merit.*"   *Id.* (emphasis in original).   "[I]n characterizing the dispute as major or minor, the central question is whether the carrier's reliance on the alleged past practice is 'totally implausible.'" *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.*, No. 98-284, 1999 U.S. Dist. LEXIS 21717, at *8 (D. Me. Feb. 5, 1999) (citing *Maine Cent. R.R. v. United Transp. Union*, 787 F.2d 780, 783 (1st Cir. 1986)).

Finally, the D.C. Circuit has directed that "[i]f there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor."   *Eastern II*, 869 F.2d at 1521. (internal quotation marks omitted).   This minor dispute presumption is "particularly strong" because a collective bargaining agreement often includes "not only the terms of the written contract but also 'the common law of a particular industry,'" which is "a question of contract interpretation within the expertise and authority of an arbitrator, not the court."   *Id.* (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579 (1960)).   The Circuit has counseled that as a result of industrial common law, there are "few disputes that arise during the term of a collective bargaining agreement [that] cannot be resolved by reference to the agreement."   *Id.*

18

## IV.   ANALYSIS

The parties' central dispute is whether American's unilateral revision of its Flight Manual in November 2007 to require its pilots to review Airport Familiarization Modules prior to assignment to certain special qualification airports while in § 6 negotiations is a major dispute or a minor dispute under the RLA.

As a threshold issue, the fact that a dispute arises while parties are in negotiations pursuant to § 6 of the RLA does not convert a minor dispute into a major dispute.  As this Circuit has explained: "The fact that the parties' legal obligations arise from § 6's statutory continuation of 'working conditions' does not automatically mean that any dispute which arises necessarily revolves around the acquisition of new rights, rather than the definition of vested ones."  *Eastern I*, 863 F.2d at 899. Accordingly, a carrier does not violate the status quo if it makes changes to the terms and conditions of employment if those changes are arguably permitted under the terms of a pre-existing collective bargaining agreement, even though the parties are in § 6 negotiations for a new agreement.  *See id.* (rejecting the proposition that the filing of § 6 notices automatically makes the dispute a major one); *IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Am.*, 377 F. Supp. 2d 54, 61 n.8 (D.D.C. 2005) (same).  Consequently, the fact that the instant

19

dispute arose during § 6 negotiations need not effect this Court's analysis regarding whether the dispute is properly classified as a major or minor dispute.

American asserts that the instant dispute is a minor dispute, arguing that its November 2007 revision is consistent with its "past practices of both unilaterally modifying its Airport Familiarization Requirements for its pilots and not providing separate pay for completing Airport Familiarization Requirements."  Def.'s Br. at 1-2; *see also* Def.'s Br. at 12-17. American argues that because its November 2007 revision is "arguably justified" by these past practices, the action presents a minor dispute over which the Court lacks jurisdiction.  The APA counters that the dispute is major.  While the APA does not dispute that American has a longstanding practice of unilaterally establishing and modifying its Airport Familiarization Requirements and of not specifically compensating pilots to complete these requirements, *see* Pl.'s Resp. to Def.'s SMF ¶¶ 24, 27, 33, 38; Pl.'s SMF ¶ 42, the APA argues that the November 2007 revision constitutes a unilateral change in the terms and conditions of employment for the pilots because it impermissibly "transform[ed] a compensated event into an uncompensated event[.]"  *See* Pl.'s Br. at 18.  The APA asserts that American's contention that it was arguably justified by the Green Book and/or past practice in making the unilateral change is both

"obviously insubstantial" and "frivolous," and asks this Court to enjoin American's alleged unilateral change to the "pilot's wages and working conditions."  Pl.'s Br. at 17, 21.

Because the linchpin of American's argument is the relationship between the 2006 Presidential Grievance and the November 2007 Revision, the Court will begin its analysis there. As discussed above, beginning in March 2006, American began a series of revisions to its Flight Manual to require pilots to review Airport Familiarization Modules prior to departure to certain special qualification airports without specific compensation.  The APA admits that this unilateral action by American "undoubtedly triggered a minor dispute, over which the APA duly filed a grievance."  Pl.'s Br. at 17.  Indeed, the APA's Presidential Grievance claims that American's introduction of the Airport Familiarization Modules without compensation for training violated both the Green Book and the parties' past practice.  *See* Def.'s Ex. 3, Presidential Grievance 06-021 ("Pursuant to the May 1, 2003, Agreement between [American] and the Airline pilots in its service, as represented by the [APA], the undersigned, on behalf of all pilots, hereby files this grievance protesting the Company's failure to properly compensate pilots for training per § 6.D, and all related sections of the Agreement, and past practice.").  Having conceded that the 2006 Presidential Grievance is a minor dispute, the APA nonetheless argues that

American's subsequent revision to its Flight Manual to require pilots to review Airport Familiarization Modules without compensation prior to assignment - rather than prior to flight - is a major dispute.  *See* Pl.'s Reply Br. at 14 ("When American changed the requirement to mandate review prior to 'assignment' to a flight . . . it implemented a requirement that had no basis either in the Green Book in the parties' past practice.").

In determining whether American's claim that the November 2007 Revision is "arguably justified" by past practice, the Sixth Circuit's decision in *Airline Professionals Association of the International Brotherhood of Teamsters v. ABX Air, Inc.*, is instructive.  No. 00-4109, 2001 U.S. App. LEXIS 26911 (6th Cir. Dec. 13, 2001).  In that case, the union alleged that the airline's unilateral revision of its policy on the use of Cockpit Voice Recorder tapes ("CVR tapes") in its Flight Operation Manual was a major dispute.  *Id.* at *2.  Specifically, the pilots had previously been able to erase CVR tapes at the conclusion of a flight, as long as no accident or safety incidents had occurred that would require investigation by the National Transportation Safety Board.  *Id.* at *3.  A dispute arose after the airline unilaterally modified this policy to prevent crewmembers from erasing the tapes after the conclusion of a flight, regardless of whether a reportable event occurred.  *Id.* at *4.  The union argued that the airline's action was a significant departure from

22

the implied terms of its agreement because it seriously impinged
on the privacy rights of the crewmembers and exposed the
crewmembers to potential disciplinary action on the basis of
tapes preserved under the new policy, and therefore constituted a
unilateral change to the pilot's working conditions.  *Id.* at *11.
The district court rejected this argument, concluding that the
change triggered a minor dispute, and the Sixth Circuit affirmed,
explaining:

> Here, the past practices of the parties indicate
> that the [Flight Operations Manual] was within the
> exclusive province of [the airline], and that [the
> airline] had the right to make unilateral changes to
> the [Flight Operations Manual] regarding a variety
> of topics, including policies that affect the
> working conditions of the crewmembers.  On only one
> occasion was this right ever challenged, and in that
> case the Union, apparently recognizing that the
> dispute involved the interpretation of the
> agreement, followed the grievance procedures for a
> minor dispute.  Considering these past practices,
> [the airlines]'s decision to unilaterally revise the
> [Flight Operations Manual] was 'arguably justified'
> by the implied terms of the collective bargaining
> agreement, making the present dispute a minor one
> under *Conrail*.

*Id.* at *12.  The instant dispute shares much in common with *ABX
Air*.  The past practices of American and the APA indicate that
the Flight Manual and Airport Familiarization Requirements are in
the exclusive province of American; it is undisputed that
American has made numerous unilateral changes to its Airport
Familiarization Requirements; and the only other time that a

related change was challenged (i.e., the 2006 Presidential Grievance), it was challenged as a minor dispute.

The APA attempts to distinguish *ABX Air* by arguing that the carrier in *ABX Air* did not change a "compensated event into an uncompensated event or do so at the same time the parties were in the process of negotiating compensation for a new training regime that included the requirement at issue." Pl.'s Br. at 20. The Court will briefly address these contentions in turn.

First, the APA's argument that American transformed a compensated event into an uncompensated event is somewhat misleading, as it is undisputed that American has never specifically compensated its pilots for completion of Airport Familiarization Requirements. *See* Def.'s SMF ¶ 24 ("The Green Book has never provided that pilots are to be compensated for time spent fulfilling American's Airport Familiarization Requirements and American has never specifically paid pilots for completing Airport Familiarization Requirements."); Pl.'s Resp. to Def.'s SMF ¶ 38 (admitting that "American has not 'specifically' compensated pilots for time spent completing American's Airport Familiarization Requirements"). Indeed, the APA filed its 2006 Presidential Grievance alleging that American had failed to properly compensate its pilots for training. *See*

Def.'s Ex. 3, Presidential Grievance 06-021.[9]  While American's
November 2007 Revision removed a pilot's ability to review an
Airport Familiarization Module during the preflight preparation
period immediately preceding the flight, this Court is
unpersuaded that it constituted a "unilateral change to the
pilot's wages."  Pl.'s Reply Br. at 21.[10]

Second, the Court will note that the APA's assertion that
the parties were in the process of negotiating compensation for a
new "distance training" regime that included Airport
Familiarization Requirements is adamantly contested by American.

---

[9]     See also Def.'s Ex. E, Dep. Ted Christensen at 39-40
("Q: And it was your understanding in February 2006 that when the
company implemented Flightscape at the [special requirement]
airports, that there was no provision for pay for the period of
time that the pilots would review the Flightscape airport
familiarization software?  A: I asked . . . and they had no
answer for that . . . [T]hey just basically said, no. . . .
Captain Don Dillman made the statement, 'If you're a
professional, you'll review this or do this as part of your
general duties.  And I said, 'That is absolutely not going to
happen.  If you want guys to do this, you need to negotiate
something to get it done.'").

[10]     Based on the evidence before this Court, it appears
that there are other "compensated times" that a pilot could
review the Airport Familiarization Modules - such as during
breaks at the Flight Academy, or during time spent between
multiday flight sequences or overnight at a hotel between
flights.  See, e.g., Def.'s Ex. G, Mark Stevens Dep. at 13-14
(explaining that he reviewed an Airport Familiarization Module
while in training, and stating that "it may have been at the
academy"); see generally Pl.'s SMF ¶ 20(discussing pilots'
compensation under the Green Book).  But cf. Second Decl. of
Thomas Westbrook (explaining that as a result of the November
2007 Revision pilots would have to spend "hours of uncompensated
review time" completing the Airport Familiarization Modules in
order to ensure they were qualified to take a last minute
assignment into a special qualification airport).

See Def.'s Reply Br. at 6-8 (discussing how "[t]he APA falsely alleges that the Airport Familiarization Modules were part of American's bargaining proposal on the issue of 'distance learning'").  Even assuming, however, that the parties were discussing revisions to the Green Book that would have encompassed Airport Familiarization Modules, for the reasons discussed above, American did not violate the status quo by implementing a revision that it was arguably permitted to make under the terms of the current Green Book and past practice, even though the parties were in § 6 negotiations for a new agreement. See Pl.'s Br. at 13 n.1 (acknowledging that "a carrier can make changes under the terms of [an] existing agreement even though parties are in Section 6 negotiations for a new agreement[,]" so long as such changes are "permitted under the existing agreement or based on the established past practices of the parties in order to comply with the status quo obligation").

In support of its argument that the November 2007 Revision is a major dispute, plaintiff relies heavily on *International Brotherhood of Teamsters v. Chautauqua Airlines*, 186 F. Supp. 2d 901 (S.D. Ind. 2001).  In *Chautauqua Airlines*, the defendant airline engaged in a number of "cost-saving measures," including the unilateral reduction of its full-time workweek from 40 to 32 hours.  *See id.* at 905 (explaining that after the airline was unable to get the union to agree to a reduction in the 40-hour

workweek, it unilaterally reduced the full-time workweek).  The Union argued that this was a major dispute because there was an established 40-hour workweek and there was no past practice or contractual term permitting the airline to unilaterally reduce the workweek for full-time employees.  *Id.* at 909-10.  The employer countered that it was a minor dispute, arguing that because the collective bargaining agreement permitted the employer to unilaterally set employees' work schedules, it similarly permitted it to determine the number of hours employees could work each week.  *Id.* at 910.  The Court concluded that the airline's contractual defense "must be termed insubstantial" because nothing in the parties' collective bargaining agreement permitted the company to unilaterally reduce the workweek of full-time employees.  *Id.* at 910-11.

Having considered *Chautauqua Airlines* and the other cases cited by the APA regarding major disputes,[11] the Court is unpersuaded that American's claims of contractual justification are "frivolous" or "obviously insubstantial."  *See Eastern II*, 869 F.2d at 1522 ("'Where the parties disagree over whether the dispute can be resolved by reference to an agreement the dispute

---

[11] *See*, *e.g.*, *Bhd. of Locomotive Eng'rs*, 1999 U.S. Dist. LEXIS 21717 (major dispute where, after failing to obtain an agreement with the union regarding mill switching, the employer began using non-union labor to perform the switching; concluding "there [was] not even arguably any past practice" allowing the employer to have non-union labor perform work previously performed by union labor).

is minor unless the claims of contractual justification are 'frivolous' or 'obviously insubstantial.'" (quoting *Nat'l Ry. Labor Conference v. Int'l Assoc. of Machinists & Aerospace Workers*, 830 F.2d 741, 746 (7th Cir. 1987))).  In light of the undisputed evidence regarding American's past practice of unilaterally modifying its Airport Familiarization Requirements, the plaintiff's agreement that the 2006 Presidential Grievance presented a minor dispute, and given the strong presumption in favor of minor disputes, *Eastern II*, 869 F.2d at 1521, the Court concludes that the pending dispute is a minor dispute over which this Court lacks jurisdiction.[12]

While the Court is sympathetic to the APA's position that the parties' past practice does not permit American to require pilots to perform an uncompensated review of its Airport Familiarization Modules prior to being assigned to a flight to a special qualification airport, *see*, *e.g.*, Pl.'s Reply Br. at 14 (discussing how the November 2007 revision deviated from past practice), this does not change the Court's conclusion that American's November 2007 Revision was "arguably justified" by the past practice of the parties.  In other words, while the APA's arguments distinguishing the November 2007 Revision from other

---

[12]  Because the Court concludes that it lacks jurisdiction to issue a status quo injunction, the Court need not consider American's alternative argument that the APA's claim is barred by the doctrine of unclean hands.

past practices regarding Airport Familiarization Requirements may very well "carry the day in arbitration," this argument does not convince the Court that American's contractual argument is "frivolous" or "obviously insubstantial."  *See Conrail*, 491 U.S. at 317-319 (concluding that the employer met its "relatively light burden" of convincing the Court that is practice was arguably justified by the implied terms of the collective bargaining agreement, but emphasizing that in rendering such a decision it did not "seek to minimize any force in the Union's arguments that the discretion afforded [the employer] by the parties' implied agreement, as interpreted in light of past practice, cannot be understood to extend this far"); *ABX Air, Inc.*, 2001 U.S. App. LEXIS 26911, at *11-12 (explaining that the union's arguments distinguishing the airline's new policy from previous unilateral decisions could persuade the arbitrator, but emphasizing that "it is not for [the] court to determine whether the implied terms of the agreement would actually permit [the airline] to impose the new policy").  Accordingly, the Court **GRANTS** defendant's motion for summary judgment, and **DENIES** plaintiff's motion for a preliminary or permanent injunction for lack of jurisdiction.

## V.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is **GRANTED,** and plaintiff's motion for preliminary

and/or permanent injunction is **DENIED**.  An appropriate Order

accompanies this Memorandum Opinion.

**Signed:**    **EMMET G. SULLIVAN**
        **UNITES STATES DISTRICT JUDGE**
        **September 29, 2009**